UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,**     ) | |
|     ) | |
| vs.     ) | CR 10-256 -(02), (03),(05), (06), (07), (08), |
|     ) | (09), (10), (11),(13), (15), (18), and (19) (RMC) |
|     ) | |
| **OMAR AGUILAR, et al.,**     ) | |
|     **Defendants.**     ) | |

**MEMORANDUM IN SUPPORT OF GOVERNMENT'S MOTION
FOR PROTECTIVE ORDER AS TO PROPOSED EXPERT WITNESS**

The United States of America, by its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum of law in support of the motion for a protective order permitting the government to withhold the identity and personal information of a proposed expert witness in El Salvador.[1]

**I. Background**

*Mara Salvatrucha,* or MS-13 is a violent transnational street gang that originated in Los Angeles, California, but quickly spread to Central American countries, in particular El Salvador, as gang members were deported. El Salvador and Honduras have become strongholds for the gang, which has a reputation for ruthless violence in those countries. Some of the most notorious examples include: In 2004, Guatemalan President Oscar Berger was threatened with a message from MS-13 which was attached to the body of a dismembered corpse. In 2005, an MS-13 member was implicated in an attack on a bus in Honduras which left twenty-eight persons, including six children, dead. MS-

---

[1] The government will submit under seal an affidavit of the witness in support of this motion. Due to the necessity of international telephone conferences with the witness, as well as the drafting and transmission of the affidavit and the translation of the affidavit, this could not be accomplished in time for simultaneous filing with this motion. It is anticipated the affidavit will be filed by mid-February.

13 was implicated in a bus fire in El Salvador in 2010, resulting in the deaths of eleven persons. In August 2011, MS-13 members in El Salvador forced a bus strike by threatening the bus drivers with violence, in order to protest a harsh anti-gang law. Shortly thereafter, gang members posted a video on YouTube threatening to murder government officials, military members, and law enforcement officers if this anti-gang law was enforced. In the video, the gang members reference other law enforcement officers whom they have killed. Indeed, in El Salvador, members of MS-13 have been implicated in the murder of numerous police officers and other government officials who threatened to enforce laws against gang members.

There have also been threats to law enforcement in the United States. In United States District Court for the Central District of California, MS-13 members were indicted for, amongst other counts, conspiring to murder a Los Angeles gang task force officer; that case is pending trial. On July 15, 2011, Walter Torres-Duke, a member of MS-13, pled guilty in United States District Court for the Eastern District of New York, to conspiring to murder an ICE agent who had investigated cliques in the Long Island area.

Although MS-13 members also commit violence within the United States, the level and brutality of violence appears to be much greater in Central American countries. One of the basic tenets of MS-13 is that persons who cooperate with law enforcement are targeted for murder. Generally, in the United States, this rule appears to apply primarily to gang members who cooperate. However, in El Salvador and other Central American countries, this rule is enforced against non-gang members, including law enforcement officers.

The Third Superseding Indictment in the instant case alleges that MS-13 is involved in racketeering acts in the United States to include murder, extortion, obstruction of justice and other

violent crimes. Overt acts in Count One, charging a violation of 18 U.S.C. §1962(d), RICO conspiracy, include acts which demonstrate the control that leaders in El Salvador exert over gang members in the United States. Audio tapes and transcripts released to the defendants include more than twenty-five telephone calls between MS-13 members in the Washington, D.C. metropolitan area and gang leaders in El Salvador prisons, or references to such calls.

In August 2005, in the District of Maryland, one of the first indictments charging MS-13 members with RICO conspiracy and other racketeering acts was returned against more than twenty MS-13 members. Several trials were held over the years, resulting in convictions for RICO conspiracy, VICAR murder and assault, and other crimes against all those who had been indicted. The El Salvadoran police officer who has been noted as an expert in the instant case testified at many of those trials, using the pseudonym "Juan Diaz." During the discovery process for each trial, the Honorable Deborah Chasanow, a United States District Judge for the District of Maryland, after reviewing affidavits and receiving *in camera* testimony from Diaz, issued a protective order permitting the government to withhold Juan Diaz's actual identity from the defense. Moreover, the court ruled each time that Diaz could testify under the pseudonym because revealing his name or other personal information could pose a substantial risk to his or his family's safety. *See,* Transcript of Record at 470, *United States v. Argueta*, No. DKC-05-0393 (Md. Feb. 23, 2010) (attached). Diaz testified in those trials about the nature and activities of MS-13 in El Salvador; he did not testify about any particular defendant or his activities. In an unreported opinion in which the issue was raised, the Fourth Circuit, after examining the sealed record of the *in camera* hearing, upheld Judge Chasanow's issuing the protective order and allowing Juan Diaz to testify using a pseudonym. The Fourth Circuit held that the district court's rulings were fully supported by the record and relevant case authority,

noting that the risk to the witness was "actual and not a result of conjecture." *United States v. Zelaya* 336 F. App'x 355, 358 (4th Cir. 2009) (unpublished).

On January 18, 2012, the Fourth Circuit, in a reported opinion, again upheld Judge Chasanow's rulings. *United States v. Ramos-Cruz,* 2012 U.S. App. Lexis 946. The court affirmed the district court's issuing of the protective order that permitted the government to withhold the witness's true identity from the defense. The court also noted that, as will be true in the instant case, the testimony of the expert witness did not involve any trial defendant or any of his activities. Rather, the expert witness provided "generalized information about the operation of MS-13," especially as it related to the gang's activities in El Salvador. *Id.* Given that limited nature of the testimony, as well as the threats to the witness and the families should the witness' true identity be provided, and that the Government provided to the defense the substance of the proposed testimony and details about the witness, the defendants in that case "were able to effectively cross-examine the witnesses without threatening their safety.*" Id.*

## II. Argument

Although Rule 16 requires the government to disclose a summary of expert opinion testimony, which would necessarily and traditionally include the identity and other personal information of such expert, this requirement is tempered by Rule 16(d) which permits the court, for good cause, "to deny, restrict or defer discovery or inspection, or grant other appropriate relief." "It is appropriate . . . to employ Rule 16(d) protective orders to curtail the public dissemination of sensitive discovery materials that may endanger witnesses or informants." *United States v. Barbeito*, 2009 WL 3645063 (S.D. W. Va. Oct. 30, 2009); *see also United States v. Moore,* 2009 WL 1033608 at *3 (2d Cir. April 17, 2009). The government is not seeking denial or deferral of the expert notice; rather, the

government is requesting that discovery be restricted to the expert's qualifications, excluding personal information, and a summary of his proposed testimony, in order to ensure the safety of the witness when he returns to El Salvador.[2] Pursuant to this Court's scheduling order the government has provided a summary of his qualifications and his opinions.

The Fourth Circuit has protected the identity of this very same witness in two separate proceedings. *United States v. Zelaya*, 336 F. App'x 355, 358 (4th Cir. 2009) (unpublished), *United States v. Ramos-Cruz,* 2012 U.S. App. Lexis 946 (January 18, 2012). In each case, the defendants claimed a violation of the Sixth Amendment right to confront witnesses. Although the Confrontation Clause generally permits a defendant to cross-examine a witness about his identity, such a right is not absolute, particularly when there is a demonstrable threat to the safety of the witness. The Supreme Court has recognized the necessity of limiting cross-examination when the personal safety of a witness is at stake. *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985). In such circumstances, the court should determine whether the identifying information is relevant to cross-examination, whether for impeachment or other purposes. The Fourth Circuit concluded that the identifying information of this witness was not necessary for effective cross-examination, particularly since his testimony is not directed toward a particular defendant. *Ramos-Cruz, supra,* 34-37.

The District of Columbia Circuit has also allowed witnesses to testify under pseudonyms, and delayed the discovery of a witness's identity for safety reasons. *United States v. Celis*, 608 F.3d 818, 829 (D.C. Cir. 2010); *see also, United States v. Warren*, 713 F. Supp. 2d 1, n.1 (D. D.C. 2010) (noting that some witnesses in the case would testify under pseudonyms). In *Celis*, the defendants were

---

[2]Similarly to the procedure followed in the Maryland case, the government anticipates requesting this Court hold an *in camera ex parte* hearing near the time of trial to permit the witness to testify under a pseudonym.

associated with FARC, a dangerous drug trafficking organization that had "directly threatened to kill at least two cooperating witnesses" and had "issued bulletins threatening death to anyone" who betrayed one of the defendants. *Celis*, 608 F.3d at 832. Due to the danger present to the witness, the court allowed the witness to testify under a pseudonym and allowed only defense counsel to know the witness's true identity six days before he was to testify. *Id.* at 829. As discussed in detail below, in this case the government is requesting it be permitted to withhold the witness' identity from defense counsel, because to disclose the information to defense counsel would deprive the government of its witness. "Juan Diaz's" supervisors will not permit him to testify if his identity is disclosed because were an MS-13 to learn the witness' true identity, and transmit that information to his cohorts in El Salvador, "Juan Diaz" and his family would be in grave danger.

    Here, the witness will testify about MS-13 and its operations in El Salvador. MS-13, especially in El Salvador, is a dangerous gang from whom significant acts of retaliation are expected. As was the case in the two previous cases involving this witness, the Government seeks to introduce this witness as an expert on the leadership, nature and activities of MS-13 in El Salvador, its relationship to MS-13 in the United States, and other matters relevant to that relationship. The government will not solicit testimony from this witness concerning defendants who are currently before this court. As has been discussed in two previous cases involving this very same witness, disclosure of the witness's true name, residence, place of birth, or specific place or manner of employment would not aid defense counsel in impeaching his testimony but would expose this witness and/or his family unnecessarily to serious danger from retaliation. *See* Transcript of Record at 470, *United States v. Argueta*, No. DKC-05-0393 (Md. Feb. 23, 2010) (protecting this witness's identity). Moreover, because of the ease of communication between El Salvadoran MS-13 members

and those in the United States, disclosure of Juan Diaz's true identity to the defendants would permit them to disseminate that information to MS-13 gang members in El Salvador and bring to fruition the very retaliation which this request for protective order is seeking to prevent.

In this case, the government is requesting that the witness' name and personal information not be released even to defense counsel. The witness has advised counsel for the government that his supervisors will not allow him to testify if his information is released to defense counsel, even if there is a court admonition that such information cannot be shared with the defendants. His personal information will not lead to impeachment information and, thus, will not deprive the defendants of an opportunity to cross-examine. However, requiring the government to release the witness' personal information to defense counsel would deprive the government and the jury of an important witness. Moreover, as was true in the witness's prior cases, the witness in this case will not offer testimony against any trial defendant or his activities, thus eliminating any confrontation concerns.

### III. Conclusion

In light of the substantial risk to the witness if his true identify were revealed, the government prays this Court grant a protective order permitting the government to withhold from defense counsel and the defendants the true identity of this witness, and any personal identifying information to include but not be limited to home and work address, specific employment, date of birth, DUI (El Salvadoran identification number), and place of birth.

Respectfully submitted,

RONALD C. MACHEN, JR.
UNITED STATES ATTORNEY


_____/s/_____
LAURA J. GWINN
U.S. Department of Justice
Organized Crime & Gang Section


_____/s/_____
WILLIAM J. O'MALLEY
Assistant United States Attorney