**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                  )
**UNITED STATES OF AMERICA**     )
                                  )
     **v.**                      )     **Criminal No. 10-256-08, -09, -20 (RMC)**
                                  )
**NOE MACHADO-ERAZO,**     )
**JOSE MARTINEZ-AMAYA,** *and*   )
**YESTER AYALA,**             )
                                  )
         **Defendants.**       )
_____)

## OPINION

       The three Defendants in this criminal case, Noe Machado-Erazo, Jose Martinez-Amaya, and Yester Ayala, are charged with offenses related to their involvement in the transnational gang MS-13. Prior to trial, the government sought special protection for its potential expert witness on MS-13's operations and structure. That potential witness—identified here as Juan Diaz—is a member of the Salvadoran National Civil Police who lives in El Salvador and works in gang enforcement. The government feared violent reprisal against him and his family if he were identified publicly as giving testimony against MS-13, which remains extremely powerful and dangerous in his home country. The government asked the Court to permit the Mr. Diaz to testify using a pseudonym and to limit the extent of required disclosure of Mr. Diaz's personal information to the Defendants and their counsel. Following a sealed *ex parte* hearing on June 17, 2013, the Court granted the government's motion. The Court now writes to expand on the reasoning for its decision.

# I.  FACTS

The Defendants are among twenty persons charged with offenses related to alleged involvement in MS-13 in *United States v. Silva*, Criminal No. 10-256 (RMC).[1]  In the most recent Superseding Indictment, Dkt. 330, Defendants are charged with, *inter alia*, involvement in a conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–68, that began "at least" as early as "the late 1990s" and that continues to the present.  Superseding Indictment [Dkt. 330] ¶ 16.  "MS-13, including its leadership, members and associates, in the District of Columbia, Maryland, El Salvador, and elsewhere" are the alleged RICO "enterprise."  *See id.* ¶ 13.

The government describes MS-13 as follows:

> *La Mara Salvatrucha*, also known as the MS-13 gang (hereafter "MS-13"), is a gang composed primarily of immigrants or descendants of immigrants from El Salvador, with members operating throughout the United States, including within the District of Columbia.  The name "*Mara Salvatrucha*" is a combination of several slang terms.  The word "*Mara*" is the term used in El Salvador for "gang."  The phrase "*Salvatrucha*" is a combination of the words "*Salva*," which is an abbreviation for "Salvadoran," and "*trucha*," which is a slang term for the warning "fear us," "look out," or "heads up."

> . . .

> MS-13 is a national and international criminal organization with over 10,000 members regularly conducting gang activities in at least twenty states and the District of Columbia, as well as in Mexico, Honduras, Guatemala, and El Salvador.  MS-13 is one of the largest street gangs in the United States.  Gang members actively recruit members, including juveniles, from communities with a large number of immigrants from El Salvador.  Members, however, can also have ethnic heritage from other Central

---

[1] Because other co-defendants have pled guilty, are pending extradition, or (in one case) had all federal charges dismissed, Messrs. Machado-Erazo, Martinez-Amaya, and Ayala are the only remaining active defendants.

American countries.   In the United States, MS-13 has been functioning since at least the 1980s.

. . .

[M]embers of MS-13 were expected to protect the name, reputation, and status of the gang from rival gang members and other persons.  MS-13 members required that all individuals should show respect and deference to the gang and its membership.  To protect the gang and to enhance its reputation, MS-13 members were expected to use any means necessary to force respect from those who show disrespect, including acts of intimidation and violence. MS-13's creed is exemplified by one of its mottos, "Matar, robar, violar, controlar," which translates in sum and substance to, "Kill, steal, rape, control."

. . .

MS-13 members were required to commit acts of violence to maintain membership and discipline within the gang, including violence against rival gang members or those they perceived to be rival gang members, as well as MS-13 members and associates who violated the gang's rules.  As a result of MS-13's frequent use of violence, innocent persons were often injured or killed. Participation in criminal activity by an MS-13 member, particularly violent acts directed at rival gang members or as ordered by the gang leadership, increased the level of respect accorded that member, resulting in that member maintaining or increasing his position in the gang, and possibly resulting in recognition as a leader

*Id.* ¶¶ 1, 3, 6, 7.

On February 1, 2012, well in advance of any of the scheduled trial dates in this case, the government filed a Motion for Protective Order as to Proposed Expert Witness, Dkt. 114.[2]  *See also* Gov't Notice of Intent to Pursue Mot. [Dkt. 282] (stating that government would pursue the protective-order motion in connection with the trial of these three defendants).  In its motion, the government asked the Court's permission "to withhold the identity and personal

---

[2] The defendants were divided into groupings for trial.  *See, e.g.*, Second Minute Order dated Nov. 4, 2011.  The earliest trial date would have been September 24, 2012.  As of this date, only the remaining three active Defendants have proceeded to trial.

information of a proposed expert witness," Juan Diaz, whom the Government anticipated offering as an expert witness "on the leadership, nature and activities of MS-13 in El Salvador [and] its relationship to MS-13 in the United States."  Mem. Supp. Gov't Mot. ("Gov't Mem.") [Dkt. 114-1] at 1, 6.  The government disclosed a summary of Mr. Diaz's qualifications and proposed testimony to defendants pursuant to Rule 16(a)(1)(6), but it asserted that "disclosure of the witness's true name, residence, place of birth, or specific place or manner of employment . . . would expose this witness and/or his family unnecessarily to serious danger from retaliation." *Id.* at 6.  The government also submitted a one-page affidavit from Juan Diaz under seal.  *See* Gov't Notice of Filing ("Diaz Aff.") [Dkt. 117].

Defendants filed an opposition on March 15, 2012, contending that their Confrontation Clause rights under the Sixth Amendment required the Court to deny the government's request.[3]  *See* Def. Opp. [Dkt. 128].  They argued that they needed access to Juan Diaz's true identity because without it, "defense counsel would be forced to leave the broad, self-serving representations made by the government and 'Juan Diaz' unchallenged, as defense counsel would not be able to conduct any independent investigation" into, *inter alia*, Mr. Diaz's credentials as an expert or potential impeachment material.  *Id.* at 7.

The Court first addressed the government's motion at a motions hearing held on March 13, 2013.  On that date, the Court reserved ruling on the motion and scheduled an *ex parte*, sealed hearing to "evaluate the extent of the danger faced by the government's proposed expert witness."  *See* March 13, 2013 Order [Dkt. 305] at 1.  On June 17, 2013, the day before

---

[3] The opposition was filed on behalf of another defendant, Omar Aguilar, by Mr. Aguilar's counsel, Paul Kiyonaga and John Carney.  The remaining three Defendants adopted Mr. Aguilar's opposition.

trial began, the Court held the *ex parte*, sealed hearing, at which Juan Diaz testified.[4]  At the hearing, Mr. Diaz expanded upon the information set forth in his sealed affidavit.  The Court summarizes his sworn affidavit and testimony in a general manner in this Opinion without providing details that could be used to determine his identity.

Mr. Diaz is a seventeen-year veteran of Salvadoran National Civil Police who presently holds the rank of investigator.  His work includes investigating gangs, including MS-13 and 18th Street (*Calle Dieciocho* in Spanish).  Mr. Diaz explained that members of Salvadoran gangs, including MS-13, have put out kill orders, referred to as "green lights," for members of Salvadoran law enforcement who investigate gang activity.  He also identified several examples of menacing or violent activity undertaken by gangs with the express goal of intimidating law enforcement, including during off hours or while law enforcement agents are at home.  In his affidavit, for example, Mr. Diaz identified an incident in late 2010 in which gang members in El Salvador made videos threatening to harm judges, prosecutors, and government agents.  He also identified an incident on January 16, 2012, in which a 36-year-old, 10-year police veteran named Juan Carlos Zepeda Burgos was killed in Ciudad Arce in El Salvador, and an incident on February 14, 2011, in which Agent Hugo Max Gonzalez Rubio was killed in Apopa, El Salvador, his body left in the street in a black plastic bag.  According to Mr. Diaz, homicides of police officers in El Salvador have increased since 2010.[5]

---

[4] Due to an unanticipated medical emergency, the case was transferred to Chief Judge Royce C. Lamberth for trial following jury selection (held on June 14, 2013) and resolution of all pretrial motions.

[5] The government also observes: "In United States District Court for the Central District of California, MS-13 members were indicted for, amongst other counts, conspiring to murder a Los Angeles gang task force officer; that case is pending trial. On July 15, 2011, Walter Torres-Duke, a member of MS-13, pled guilty in United States District Court for the Eastern District of New York, to conspiring to murder an ICE agent who had investigated cliques in the Long Island area." Gov't Mem. at 2.

Mr. Diaz explained that, in trials in El Salvador, the names of witnesses whose safety might be endangered are generally not disclosed.  Instead, they are permitted to testify using code names and numbers.  He also explained that, while gangs often tolerate police testimony in El Salvador, his proffered testimony in this case would be different and would likely result in MS-13 issuing a green light against him for two reasons.  First, gangs distinguish between fact testimony given by officers about investigations they conducted personally, which is seen as routine and fair, and expert testimony about MS-13 generally, which is viewed as a provocation and is more likely to cause retribution.  Second, MS-13 members believe that only members may discuss the gang's rules, so having a police officer testify about those rules in court would be seen as a challenge to the gang.

Mr. Diaz explained that he and his family would be at risk if his real name or identifying information were released, noting that senior members of MS-13 are aware of cases in the United States involving MS-13 and would be likely to learn of his involvement.  Asked by the Court how serious the danger was, Mr. Diaz testified: "It would be a serious risk for me . . . if it were an open case, if my name were to come out or my picture were to come out."  He also stated that, because of MS-13's presence in the United States, the gang would be required to carry out a green light in either country.

At the conclusion of the hearing, the Court granted the government's motion, noting that "Mr. Diaz's testimony established imminent and grave risk to his safety and his family's safety if his real name were used."  *See* June 17, 2013 Protective Order [Dkt. 372] at1. The Court directed that Mr. Diaz be permitted to testify at trial under pseudonym, that the government could withhold from Defendants and their counsel Mr. Diaz's true identity ("including but not limited to: home and work address, specific employment, date of birth, El

Salvadoran identification number, and place of birth"), and that "counsel for Defendants [could] not in any way seek to elicit testimony or seek to admit evidence before the jury concerning the expert witness's true identity or the fact that his identity before the jury [was] a pseudonym." *Id.* at 1–2.

Mr. Diaz testified at trial on June 18 and 20, 2013. The Court permitted him to offer testimony as an expert "on MS-13 in El Salvador, its structure, its rules and activities." June 18, 2013 P.M. Trial Tr. at 10, 15. As proffered by the government, Gov't Mem. at 3, he did not "testify about any particular defendant or his activities." Although counsel for Mr. Machado-Erazo conducted a voir dire of Mr. Diaz, no defendant objected to Mr. Diaz testifying as an expert. The Court has not been made aware of any issues of compliance with the protective order.

## II. ANALYSIS

### A. The Nature of the Right of Confrontation

"In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The Confrontation Clause guarantees criminal defendants the right to confront witnesses offering testimonial evidence in court and to cross-examine those witnesses. *See Crawford v. Washington*, 541 U.S. 36, 51 (2004) ("[T]he principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused."). Defendants thus generally have the right to question an adverse witness about identifying information, including name and address. *See Smith v. Illinois*, 390 U.S. 129, 131 (1968) ("[T]he very starting point in exposing falsehood and bringing out the truth through cross-examination must necessarily be to ask the witness who he is and where he lives."). The right to a witness's identity, however, is not absolute. *See, e.g., Chavis v. North Carolina*, 637 F.2d 213,

226 (4th Cir. 1980) ("[C]ases have held that a trial court may limit cross-examination if the information sought could endanger the witness."); *Smith*, 390 U.S. at 133–34 (instructing that a trial court may limit otherwise permissible questions if they would endanger the witness) (White, J., concurring).

As the Supreme Court stated in the context of requiring the government to reveal the identity of a non-testifying confidential informant:

> We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors.

*Roviaro v. United States*, 353 U.S. 53, 62 (1957).

In balancing the defendants' ability to cross-examine effectively with a witness's safety, a number of cases have held that a trial court may protect the true identity of a testifying witness for that witness's safety. *See United States v. Ramos-Cruz*, 667 F.3d 487, 500 (4th Cir. 2012); *United States v. El-Mezain*, 664 F.3d 467 (5th Cir. 2011); *Siegfriedt v. Fair*, 982 F.2d 14, 17 (1st Cir. 1992); *United States v. Rangel*, 534 F.2d 147, 148 (9th Cir. 1976); *United States v. Palermo*, 410 F.2d 468, 472 (7th Cir. 1969) ("[W]here there is a threat to the life of the witness, the right of the defendant to have the witness' true name, address and place of employment is not absolute. . . . Under almost all circumstances, [however,] the true name of the witness must be disclosed."); *cf. Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) (Trial judges possess "wide latitude . . . to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness'[s] safety, or interrogation that is repetitive or only marginally relevant.").  In such cases, the government

bears the burden in demonstrating "that the threat to the witness is actual and not a result of

conjecture." *Ramos-Cruz*, 667 F.3d at 500 (quoting *Palermo*, 410 F.2d at 472). In doing so, the

government need not tie a threat to specific defendants. *See United States v. Celis*, 608 F.3d 818,

832 (D.C. Cir. 2010) ("The appropriateness of using pseudonyms to protect witnesses does not

depend on whether the threat to the witness comes directly from a defendant or from another

source."). To the extent possible, however, courts encourage disclosure of background material

to defendants to permit cross-examination to be as effective as possible. *E.g.*, *El-Mezain*, 664

F.3d at 492 ("The Government disclosed to the defense over twenty volumes of material that Avi

used to formulate his expert opinion about Hamas financing. Moreover, the Government agreed

in pretrial filings that the defense would be permitted to ask Avi about his background, his

training and experience with the ISA, his legal education, and his potential bias in favor of

Israelis in the West Bank.").

### B. Factually Similar Fourth & D.C. Circuit Cases

The government relies heavily on Fourth Circuit precedent endorsing the exact

procedure it proposes here with respect to expert testimony offered in trials in the District of

Maryland by this same Juan Diaz. *See* Gov't Mem. at 3–4. The government explains:

> In August 2005, in the District of Maryland, one of the first
> indictments charging MS-13 members with RICO conspiracy and
> other racketeering acts was returned against more than twenty MS-
> 13 members. Several trials were held over the years, resulting in
> convictions for RICO conspiracy, VICAR murder and assault, and
> other crimes against all those who had been indicted. The El
> Salvadoran police officer who has been noted as an expert in the
> instant case testified at many of those trials, using the pseudonym
> "Juan Diaz." During the discovery process for each trial, the
> Honorable Deborah Chasanow, a United States District Judge for
> the District of Maryland, after reviewing affidavits and receiving in
> camera testimony from [Mr.] Diaz, issued a protective order
> permitting the government to withhold Juan Diaz's actual identity
> from the defense. Moreover, the court ruled each time that [Mr.]
> Diaz could testify under the pseudonym because revealing his

> name or other personal information could pose a substantial risk to
> his or his family's safety.  [Mr.] Diaz testified in those trials about
> the nature and activities of MS-13 in El Salvador; he did not testify
> about any particular defendant or his activities.

*Id.* (citing *United States v. Cruz et al.*, Cr. No. 8:05-cr-393-DKC (D. Md. filed Aug. 23, 2005)).

The Fourth Circuit upheld complete withholding of Juan Diaz's true identity in different trials on three occasions: *United States v. Argueta*, 470 F. App'x 176, 179–80 (4th Cir.), *cert. denied*, 133 S. Ct. 524 (2012); *United States v. Ramos-Cruz*, 667 F.3d 487, 500–01 (4th Cir. 2012) (no petition for *certiorari* filed); *United States v. Zelaya*, 336 F. App'x 355, 357–58 (4th Cir. 2009), *cert. denied*, 130 S. Ct. 2341 (2010).

The Fourth Circuit's first decision was in *Zelaya*, in which the court stated that a judge can restrict information about a witness on cross-examination if the government showed a danger to the witness's safety that was "actual and not a result of conjecture."  336 F. App'x at 358 (quoting *Palermo*, 410 F.2d at 472).  When the government makes such a showing, the judge must then determine "whether the information must be disclosed in order not to deny effective cross-examination."  *Id.* (quoting *Palermo*, 410 F.2d at 472).  Applying that standard, the *Zelaya* court held:

> Our review of the appellate briefs and the sealed affidavits, as well
> as the sealed transcripts of an *ex parte* and *in camera* hearing in
> which the district judge conducted an examination of the
> witnesses, persuade us that the district court did not abuse its
> discretion in preventing the defendants from learning the true
> identity of the two El Salvadorian government witnesses. The
> information provided to the district court indicated that the threat
> to these witnesses and their families, should their true identities be
> provided, was "actual and not a result of conjecture."
> Furthermore, the government disclosed to the defense details of
> these two witnesses, including a pretrial notice regarding the nature
> of their testimony and a transcript of their previous sworn
> testimony on the same subject matter presented in this case. This
> information enabled the defendants to effectively cross-examine
> the witnesses without threatening their safety.

*Id.* (citation omitted).

In *Ramos-Cruz*, the Fourth Circuit adopted the reasoning of *Zelaya* and upheld the district court's decision to withhold "Juan Diaz's" (and one other witness's) true identity from defense counsel and to permit pseudonymous testimony. *Ramos-Cruz*, 667 F.3d at 500–01. The convictions were affirmed unanimously, but one judge dissented from the panel's holding on the pseudonymous-testimony issue.

In *Ramos-Cruz*, the witnesses submitted *in camera* affidavits "explaining the specific threat to them were their identities revealed." *Id.* at 501. Because the affidavits were sworn in 2006 and 2007, well in advance of trial, the district court "conducted an *ex parte* hearing and examined the two El Salvadorian officers to determine whether the disclosure of their names, addresses, or dates and places of birth to the defendant would continue to pose a danger to the officers and their families." *Id.* At the hearing, the district court concluded that the threat was still extant and granted the requested protective order.

*Ramos-Cruz* found no abuse of discretion in withholding the witnesses' identities. The court found that the witnesses "specifically explained the heightened level of danger to which El Salvadorians who testify against MS-13 in U.S. Courts are subject. They then connected that threat to the specific investigative work they perform." *Id.* Such specificity was sufficient to grant the protective order. *Id.* The *Ramos-Cruz* court also emphasized "the limited focus of the witnesses' testimony." *Id.* The witnesses did not offer any direct evidence involving Mr. Ramos-Cruz or his activities; instead, "[t]hey merely provided background information about the internal working of MS-13 generally." *Id.*

The Fourth Circuit treated *Argueta* as a straightforward case in which *Ramos-Cruz* "controlled." 470 F. App'x at 179. It again found "no abuse of discretion in the district court's decision to allow Mr. Diaz to testify under the pseudonym without disclosing any

identifying information to Argueta's defense counsel." *Id.* at 180. In reaching that conclusion, the Fourth Circuit stated:

> As was the case in *Ramos–Cruz*, the government provided Argueta with the substance of Mr. Diaz's testimony, which concerned only general information regarding the MS–13 gang operations and did not specifically involve Argueta. The government also provided Argueta with transcripts of the witness's testimony in prior cases. Furthermore, the district court conducted an *in camera* review of affidavits attesting to the personal and professional safety implications of disclosing Mr. Diaz's true identity and conducted an *ex parte* hearing regarding the continuing danger to Mr. Diaz and his family. Based on this evidence of an actual threat to Mr. Diaz's safety, the district court allowed his testimony under the pseudonym.

The defendants in this case argue that relying on the Fourth Circuit cases is inconsistent with the D.C. Circuit's opinion in *United States v. Celis*, 608 F.3d 818 (D.C. Cir. 2010).[6] In *Celis*, the government sought a protective order from the district court similar to the one sought here. *Id.* at 829 ("[T]he government had filed under seal a motion *in limine* seeking a protective order barring the release of the true identities of witnesses from Colombia and allowing these witnesses to testify under pseudonyms."). The district court granted the motion in part. Instead of completely protecting the identities of the witnesses, the trial judge required the government, seven days before the witness was to testify, to disclose the witnesses' true identities to defense counsel, the defendant, and one member of the defense team located in the United States. *Id.* The true identities could also be shared with individuals in Colombia but *only* with prior approval from the Court. *Id.* Finally, the witnesses were allowed to testify under pseudonyms. *Id.*

---

[6] The defendants in *Celis* were associated with *Fuerzas Armadas Revolucionaras de Colombia* ("FARC"), "the most significant drug trafficking organization in Colombia." *Celis*, 608 F.3d at 826.

On appeal, the D.C. Circuit approved the use of the protective order based on the specific facts of that case. *See* 608 F.3d at 833 ("The protective order and its management by the district court reflect an appropriate balancing of interests in the relevant case-specific context in view of the factors described in *Alford* and *Smith* as well as *Roviaro*, 353 U.S. at 61–62"). The *Celis* court reasoned:

> The district court balanced the reality of potentially life-threatening dangers to the protected witnesses and their families, and the defense need to prepare to cross-examine the protected witnesses by allowing defense access to the true identities of the protected witnesses days before their testimony and, when shown to be necessary for those purposes, allowed investigation using these true identities in the United States and in Colombia.

*Id.*

### C. Application to this Case

Defendants' opposition to the procedure proposed by the government depends on the argument that this Circuit's precedent, *Celis*, is inconsistent with the Fourth Circuit's precedent in *Ramos-Cruz* and the related cases. *See* Def. Opp. at 5 ("[T]he *Ramos-Cruz* and *Zelaya* opinions[ ] are inconsistent with the jurisprudence of the Supreme Court as demonstrated above and do not reflect the law in this Circuit."). Put another way, Defendants assert that *Celis* stands for the proposition that complete withholding of a witness's true identity is impermissible in the D.C. Circuit; instead, at the very least, the defense must have at least some access to the real name of the witness for investigative purposes. *Id.* (arguing that *Celis* "affirmed the use of pseudonyms during testimony primarily because the true identities of the witnesses *were* shared with defense counsel").

Closer reading of *Celis* confirms that the D.C. Circuit was not adopting a *per se* rule requiring disclosure of a witness's true identity. The *Celis* court endorsed the procedure followed by the district court on the facts of that case, 667 F.3d at 833 (referring to "an

13

appropriate balancing of interests in the relevant case-specific context"), but it did not purport to make that procedure a binding minimum standard of disclosure.  Thus, *Celis* is consistent with *Ramos-Cruz* and the Fourth Circuit cases, establishing that the district court must balance witness safety with a need to give meaning to the Confrontation Clause right.  *Id.* ("The protective order and the district court's management of it involved a delicate balancing of interests necessitated by extraordinary circumstances warranting special measures to protect key witnesses").  *Celis* cautions that courts must make careful factual findings, doing everything possible to make sure that defendants receive the information that they can, but it does not create a *per se* rule of disclosure.

"[T]aking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors," and after "balancing the public interest in protecting the flow of information against the individual's right to prepare his defense," *see Roviaro*, 353 U.S. at 62, the Court granted the government's motion because the threat to Juan Diaz is "actual and not a result of conjecture."  *Ramos-Cruz*, 667 F.3d at 500. Review of Mr. Diaz's affidavit, as well as his testimony at the sealed *ex parte* hearing, demonstrated that Salvadoran law enforcement agents who provide testimony against MS-13 face a grave and immediate danger of violent, likely fatal, retribution.  This showing is at least as great as that accepted by the Fourth Circuit in *Ramos-Cruz* and the related cases.  *See id.* at 501 ("The witnesses here, however, specifically explained the heightened level of danger to which El Salvadorians who testify against MS–13 in U.S. courts are subject. They then connected that threat to the specific investigative work they perform in El Salvador. We believe that this level of specificity is sufficient.").  Crucially, Mr. Diaz testified that the danger to law enforcement officers who testify against MS-13 is ongoing and, in fact, has increased since 2010.  He also

made clear that, because MS-13's reach crosses the thousands of miles between the United States and El Salvador, gang members are quite capable of learning of his expert testimony in this case and, if they did, would likely retaliate because they would view it as a threat or provocation, far more threatening to them than his normal investigative work in El Salvador.  The Court thus found that Juan Diaz, as well as his family, would face grave, actual danger if he were to give the proffered testimony under his true name.

The inquiry thus shifted to whether the Defendants' right to cross-examination could be preserved without access to Juan Diaz's true identity.  *See El-Mezain*, 664 F.3d at 492 (discussing nature of information disclosed to the defense and concluding that the "defense was therefore well-armed with information upon which to confront and cross-examine both Avi and Major Lior," who testified under pseudonym).  The Court concluded that it could.  Here, as in *Ramos-Cruz* and the other Fourth Circuit cases, the government disclosed a summary of Juan Diaz's qualifications and expert testimony to the Defendants pursuant to Fed. R. Crim. P. 16(a)(1)(G).  *See Ramos-Cruz*, 667 F.3d at 501 (noting that the government "disclosed the substance of the testimony the two witnesses in question would provide at trial").  Through the government's steadfast reliance on the Maryland MS-13 cases, Defendants were on notice that this same Juan Diaz had testified several times in that district under the same pseudonym, and they could have procured transcripts of his testimony in those cases to prepare themselves.  In addition, the government proffered that Mr. Diaz would testify generally at trial about his credentials and qualifications as an expert witness on MS-13 and would be subject to cross-examination about them.[7]  Because the Defendants had access to Juan Diaz's expert report, a

---

[7] Mr. Diaz's trial testimony bore the government's proffer out precisely.  Mr. Diaz testified and was subject to an extensive voir dire about his qualifications and knowledge base, all without revealing any personal identifying information.

summary of his qualifications, and his prior testimony, they had access to almost the entire

universe of possible ammunition for cross-examination.  *See El-Mezain*, 664 F.3d at 492–93

(noting that defendants were able to demonstrate, *inter alia*, pseudonymous expert's "lack of

knowledge and familiarity with the subject matter" and bias).  Additionally, as in the Maryland

MS-13 cases, "Juan Diaz" was only offered to provide "background information about the

internal working of MS-13 generally," not to give factual testimony about any activities

undertaken by these specific defendants.[8]  *Ramos-Cruz*, 667 F.3d at 501 (emphasizing "the

limited focus of the witnesses' testimony").  That Juan Diaz would only provide background

information on MS-13 is an important distinction between this case and *Celis*, in which the

witnesses shielded by the protective order were "insider witnesses" who lived in Colombia and

testified "about their own involvement with appellants and the FARC in drug trafficking."  *Id.* at

830 n.5 & 833.  The more general nature of his testimony and the Defendants' ready access to

impeachment material about that testimony distinguished these facts from, for example, a

pseudonymous eyewitness whose background and expected testimony are a mystery to the

accused.

>       These factors show that, even without Mr. Diaz's true identity, Defendants had an

opportunity for effective cross-examination.  *See Van Arsdall*, 475 U.S. at 679 ("[T]he

Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-

examination that is effective in whatever way, and to whatever extent, the defense might wish."

(quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985))).  Accordingly, "when . . . safety

concerns are balanced against the defendants' ability to conduct meaningful cross-examination,

the scale tips in favor of maintaining the secrecy of the witnesses' names."  *See El-Mezain*, 664

---

[8] Again, the government was true to its word at trial.  Mr. Diaz only gave general testimony about MS-13, never touching on the specific acts allegedly committed by these Defendants.

F.3d at 492; *see also Roviaro*, 363 U.S. at 62 (requiring the Court to "balance[e] the public interest in protecting the flow of information against the individual's right to prepare his defense").

### III.  CONCLUSION

For the foregoing reasons, when the need to preserve the Defendants' right to effective cross-examination was balanced with the genuine and continuing threat to the safety of Juan Diaz and his family, the Court found that Juan Diaz could testify as an expert witness on the structure and operations of MS-13 in El Salvador without disclosure of his true name or personal identifying information to the defense.  The Court thus granted the Government's Motion for Protective Order as to Proposed Expert Witness, Dkt. 114.


DATE: June 28, 2013


_____/s/_____
ROSEMARY M. COLLYER
United States District Judge